Von Eric BRIDGEWATER, Appellant,

v.

The STATE of Texas, State.

No. 2–94–077–CR.

Court of Appeals of Texas,
Fort Worth.

Aug. 3, 1995.

**350**

Robert McCrarey, Fort Worth, for appellant.

Tim Curry, Dist. Attorney, Betty Marshall and Charles M. Mallin, Asst. Chiefs, Appellate Section, Steven W. Conder and Terri Moore, Assistants, Fort Worth, for appellee.

Before CAYCE, C.J., and DAY and RICHARDS, JJ.

## OPINION

DAY, Justice.

Von Eric Bridgewater appeals his conviction for capital murder. A jury found Bridgewater guilty and the trial court sentenced Bridgewater to life confinement. We affirm the verdict and sentence.

In his first point of error, Bridgewater asserts that insufficient evidence existed to support his conviction. We disagree.

▆ In reviewing the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict. *Narvaiz v. State,* 840 S.W.2d 415, 423 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Moreno v. State,* 755 S.W.2d 866, 867 (Tex. Crim.App.1988).

"This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

▆ The sufficiency of the evidence is a question of law. The issue on appeal is not whether we as a court believe the State's evidence or believe that the defense's evidence outweighs the State's evidence. *See Matson v. State,* 819 S.W.2d 839, 846 (Tex. Crim.App.1991); *Wicker v. State,* 667 S.W.2d 137, 143 (Tex.Crim.App.), *cert. denied,* 469 U.S. 892, 105 S.Ct. 268, 83 L.Ed.2d 204 (1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson,* 819 S.W.2d at 846. The standard for review is

the same for direct and circumstantial evidence cases. *Geesa v. State,* 820 S.W.2d 154, 158–62 (Tex.Crim.App.1991).

■ In August 1992, the deceased, Yousef Mirzadeh, and Shahin Shamaei were closing the Monte Carlo Sea and Grill restaurant. Mirzadeh and Shamaei opened the self-locking kitchen door so that Mirzadeh could go to his car. When they opened the door, two armed and masked African–American men entered the kitchen and began to beat them. The taller of the two men beat Mirzadeh, while the shorter one beat Shamaei.

The two masked men demanded to know the location of the safe and money. When Mirzadeh claimed there was no safe or money, the taller masked man beat him more. Shamaei then offered to take the men to the money. While Shamaei retrieved the money, Mirzadeh ran out the fire exit with the taller man in pursuit. Shamaei saw the taller man shoot Mirzadeh twice.

The shorter masked man then ran toward the kitchen where a third masked man appeared. Both of these two masked men ran off. Shamaei quickly called 9–1–1. After the masked men left, Shamaei found Mirzadeh outside the main door. Mirzadeh died from his gunshot wounds.

Around the same time as the shooting, Paul Valadez, a neighbor, heard six shots fired near the Monte Carlo restaurant. He then heard voices and saw people getting into a car. At trial, Valadez identified the car photographed in State's exhibits three, four, and five as the car he saw driving away from the restaurant the night of the murder. He also identified the voices he heard as belonging to African–American males.

After midnight on the night of the murder, Frashirla Roblow received a phone call from Andre Crosby to come and get him after she went to pick up her friend Ayala Mitchell. After picking up Mitchell and Andre, Roblow went and picked up Bridgewater. Later, the two men asked Roblow to drive by the Monte Carlo restaurant. After driving by and seeing the police there, Bridgewater told Mitchell that he had done some gangster activities

that night. They again rode by the Monte Carlo restaurant later that night when Bridgewater was driving before turning around to go to an apartment. At this apartment, Bridgewater went over to a Cadillac to retrieve his "Raiders" hat.[1] The next day, both women observed Andre's brother, Marlon Crosby, with a gun resembling State's exhibit six.

The police subsequently arrested Bridgewater. While in jail, Bridgewater had several conversations with another prisoner, Nathaniel Von Campbell. According to Campbell, Bridgewater told him that he was in jail for murder and that he had a partner by the name of "Dre" who would not "give him up." [2] Furthermore, Campbell overheard Bridgewater tell another prisoner that he had killed someone.

While in jail, Bridgewater called Mitchell and told her that he did not commit the robbery and murder because he was with her and Roblow that night. Mitchell, however, testified that Bridgewater was not with her until after midnight.

Leonard Miller testified at trial that he had lent Marlon Crosby his car on the night of the murder. When he got his car back from Marlon, he took Marlon and Bridgewater to an apartment. Once at the apartment, Marlon retrieved two guns from Miller's glove box—a .45 caliber gun and a smaller caliber gun. Marlon kept the .45 and handed the smaller caliber gun to Bridgewater. A subsequent search of the car by the police resulted in the discovery of a .22 caliber shell casing under the backseat. At trial, Miller identified the car in State's exhibits three, four, and five as his car that he had lent to Marlon.

In addition to these witnesses, the State called Andre Crosby. Andre had received ten years' deferred adjudication for his role in this offense in an earlier proceeding where he allegedly made statements that directly connected Bridgewater with the murder. He, however, refused to testify against Bridgewater at trial. In fact, Andre denied

1. At trial, Roblow identified the Cadillac as the car photographed in State's exhibit three.

2. Mitchell and Roblow both testified that Bridgewater referred to Andre Crosby as "Dre."

going to the Monte Carlo restaurant and participating in the robbery and murder even though he had previously pled guilty to this offense. Instead, he claimed that his prior statements were lies.[3] He did testify that he, his brother Marlon, and Bridgewater drove around in Miller's car the night of the murder.

In response, the State introduced the testimony of Bill Cole, an investigator with the Tarrant County Criminal District Attorney's Office. According to Cole, Andre freely discussed the offense with him and stated: (1) he, Marlon, and Bridgewater waited outside the restaurant wearing masks and armed with a .9mm, a .45 caliber, and a .22 caliber; (2) Bridgewater carried the .22 caliber; (3) they barged into the restaurant and Marlon and Bridgewater beat the men while Andre guarded the door; (4) upon hearing shots he ran outside to the maroon Cadillac; (5) the men drove to his grandmother's house where they planned an alibi involving Roblow and Mitchell; (6) they later drove by the restaurant twice that night; and (7) Andre identified State's exhibit six as resembling the gun used by Bridgewater.

Finally, the doctor who performed the autopsy testified that he discovered five entry, three exit, and two graze gunshot wounds to Mirzadeh caused by two weapons. The fatal wound was caused by a smaller caliber bullet, such as a .22, that lacerated his thoracic aorta.

After viewing this evidence in the light most favorable to the verdict, we find sufficient evidence existed to connect Bridgewater to the murder and to support the jury's verdict. We overrule point of error one.

In Bridgewater's second point of error, he asserts the trial court erred in allowing the State to elicit evidence that Bridgewater was a member of the street gang, the "Black Villain Assassins." We disagree.

■ During trial, the State called Andre Crosby to testify against Bridgewater as a

condition of his plea bargain agreement for this robbery and murder. Andre refused to testify against Bridgewater and denied any involvement in this crime even though he had pled guilty and had testified that he was involved in the crime during his own trial. The trial court then allowed the State to ask questions about the "Black Villain Assassins" to demonstrate Andre's motive and bias for changing his testimony. It, however, specifically instructed the jury both before and after the questioning that the jury could only consider this testimony to determine Andre's motive or bias.

The complained-of questions and testimony were as follows:

[STATE]: Now, your brother Marlon, all y'all's friends that hang around together out in the Como area, y'all are part of the Black Villain Assassins?

[DEFENSE COUNSEL]: Objection, Your Honor. . . .

THE COURT: The objection is overruled. Do you want a limiting instruction?

[DEFENSE COUNSEL]: Yes, please.

THE COURT: Ladies and gentlemen, you are instructed that such testimony is elicited for the sole purpose of aiding you, if it does, in determining the bias or motive, if any, of this witness in his testimony. You will consider it, if you do, for no other purpose whatsoever.

Q. Is that right, y'all are part of the Black Villains Assassins?

A. No, ma'am.

Q. BVA for short? You've heard it, haven't you?

A. Yes.

Q. And isn't it a rule in the BVA that you don't, quote, talk against one of your friends?

A. I don't know anything about it.

Q. You don't know anything about what?

3. Andre denied stating that: (1) he, Marlon, and Bridgewater each had a gun and entered the restaurant demanding money; (2) he guarded the back door while the others went into the interior of the restaurant; (3) he heard shots fired; (4) he ran back to the car and the men

went to his grandmother's house where they planned their alibi; (5) he, Bridgewater, Roblow, and Mitchell drove by the restaurant twice the night of the murder; and (6) Marlon and Bridgewater shot the victim numerous times.

A. The gang.

On redirect examination, the following transpired:

[STATE]: Andre, do you agree that you told us that you were afraid?

A. Yes.

Q. Can you tell us what you were afraid of?

A. My life.

Q. What do you mean, your life?

A. Labeled as a snitch.

Q. Labeled as a snitch. What else are you afraid of?

A. That's mainly it.

Q. Were you afraid that you would be killed?

A. Yes.

Q. You told us that, too, didn't you?

A. Yes.

Bridgewater argues that these questions on the "Black Villain Assassins" were irrelevant and the trial court erred in allowing them. We addressed a similar argument in *McKnight v. State*, 874 S.W.2d 745, 746 (Tex. App.—Fort Worth 1994, no pet.). In *McKnight*, the State impeached a defense witness using the witness's gang affiliation with the defendant to show bias. While our case involves the State impeaching its own witness, we find *McKnight's* holding that gang affiliation is relevant to show bias controlling.[4] According to *McKnight*:

Because all relevant evidence is admissible, except as otherwise provided by the constitution, by statute, or by applicable rule, we must determine whether evidence of gang association was relevant, and if it was, whether the constitution prohibited its admission. *See* FED.R.EVID. 402; TEX. R.CRIM.EVID. 402. Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Id.* at 401. A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be

without such testimony. *United States v. Abel*, 469 U.S. 45, 49, 105 S.Ct. 465, 468, 83 L.Ed.2d 450 (1984). Evidence of gang membership bears on the witness's veracity and bias. *Abel*, 469 U.S. at 57, 105 S.Ct. at 471. Therefore, evidence showing [the witness's and the defendant's] membership in the gang was sufficiently probative of [the witness's] possible bias in favor of [the defendant] to warrant its admission into evidence. *Id.* 469 U.S. at 47, 105 S.Ct. at 467.

. . . .

In *Abel*, the Supreme Court held that the government could impeach a defense witness by showing that both the defendant and the witness were members of the Aryan Brotherhood, and that members were sworn to lie on behalf of each other. *Abel*, 469 U.S. at 45, 105 S.Ct. at 465. Common membership of a witness and a party in an organization, even without proof that the witness or party has personally adopted its tenets, is probative of bias. *Id.* 469 U.S. at 51, 105 S.Ct. at 469. Therefore, evidence of [the witness's and defendant's] membership in the gang was properly admitted if it was admitted for the limited purpose of showing bias.

*McKnight*, 874 S.W.2d at 746–47.

■ Bridgewater also argues that the prejudicial effect of the State's questions on the "Black Villain Assassins" substantially outweighs any probative value, and thus, they should have been excluded. *See* TEX. R.CRIM.EVID. 403. We find the evidence regarding the "Black Villain Assassins" constituted very probative evidence because it showed Andre's potential bias or motive in refusing to testify against Bridgewater and in claiming that neither he nor Bridgewater participated in the robbery and murder in spite of his previous testimony and guilty plea at his own trial. Furthermore, we find the prejudicial effect of the evidence was limited by the court's two instructions to the jury to consider the evidence only for impeachment purposes. Accordingly, we find the trial court did not abuse its discretion in allowing the State's questions regarding the

4. A party may impeach his own witness. *See* TEX.R.CRIM.EVID. 607.

"Black Villain Assassins." We overrule point of error two.

■ In Bridgewater's third point of error, he asserts the trial court erred in not granting his motion for a mistrial when a prosecution witness used the term "gang." The complained-of testimony was as follows:

[STATE]: Like they had a relationship?

A. Yes. And other than that—He's already said that I can't say the thing about gangs.

[DEFENSE COUNSEL]: Your Honor, I object and ask that the jury be removed from the courtroom.

. . . .

[DEFENSE COUNSEL]: He purposely violated the rule he heard about in court under her direct examination. And I object to it because it's a purposeful attempt to bring about either a mistrial or to purposely damage my client by information that's not admissible before the jury.

THE COURT: I'll sustain your objection.

. . . .

[DEFENSE COUNSEL]: I ask that the Court instruct the jury to disregard the comment of the witness.

THE COURT: The jury is instructed to disregard this witness's mention of the word gang. You will not consider it for any purpose whatsoever. It is no part of this case. This witness knew better. If he does such a thing again, I'm going to hold him in contempt.

As far as you're concerned, that word was never uttered. You never heard it. It never happened. And you will not consider it. You will not discuss it. You will erase it from your minds.

[DEFENSE COUNSEL]: And because of the nature of the comment, I move for a mistrial.

THE COURT: Denied.

■ Although the State urges us to find that the statement was proper and the objection should have been overruled instead of sustained, we will not address this argument since the instruction to disregard cured any error that possibly existed.[5] *See, e.g., Kessler v. State,* 850 S.W.2d 217, 220 (Tex.App.—Fort Worth 1993, no pet.); *Strong v. State,* 739 S.W.2d 506, 508 (Tex.App.—Fort Worth 1987), *aff'd,* 773 S.W.2d 543 (Tex.Crim.App. 1989). We overrule point of error three.

In point of error four, Bridgewater asserts that insufficient evidence existed to support submitting a charge on the law of the parties to the jury. We disagree.

■ A trial court must charge the jury fully and affirmatively on the law applicable to every issue raised by the evidence. *Taylor v. State,* 856 S.W.2d 459, 470 (Tex. App.—Houston [1st Dist.] 1993), *aff'd,* 885 S.W.2d 154 (Tex.Crim.App.1994). If evidence presented at trial raises an issue, and a jury charge is requested on that issue, then a charge on that issue must be given. *Id.* Accordingly, our determination focuses on whether the State presented evidence that raised the issue of the law of the parties.

■ Here, Bridgewater makes basically the same argument that he made in point of error one—there is no evidence, or alternatively, insufficient evidence to connect him with the crime. Thus, under point of error four, the trial court should not have charged the jury on the law of parties. After examining all the evidence from trial, we find the

<hr/>

5. Bridgewater never argues in point of error three that the trial court's instruction failed to cure any error so that his motion for a new trial should have been granted. In fact, he argues points of error two and three together and basically asserts that the witness's use of the word "gang" was irrelevant, or if it was relevant, then the probative value was substantially outweighed by its prejudicial effect. He then argues that the trial court's error constituted harmful error under Tex.R.App.P. 81(b). The trial judge, however, agreed that the witness's reference to a gang was error when she sustained Bridgewater's objec-

tion. Thus, the issue in point of error three was not whether the term "gang" was relevant or that its prejudicial effect substantially outweighed its relevance; instead it was whether the trial court's instruction to disregard cured any error in the witness's use of the word gang. Bridgewater fails to present any argument or authority on this issue. Normally, this constitutes waiver of the point of error. *See* Tex. R.App.P. 74(f). In the interest of justice, however, we did not overrule point of error three on this basis.

State did present enough evidence to raise the issue of the law of parties. Accordingly, the trial court did not err in charging the jury on the law of the parties. We overrule point of error four.

 In point of error five, Bridgewater asserts that TEX.CODE CRIM.PROC.ANN. art. 1.13 (Vernon Supp.1995) is an unconstitutional violation of the Eighth and Fourteenth amendments to the United States Constitution because it precludes the jury from considering mitigating evidence in assessing punishment since there is no punishment hearing. Article 1.13, however, does not address the punishment phase of a trial. Instead, it simply provides that the defendant may waive his right to a jury trial when the State does not seek the death penalty in a capital felony. *See* TEX.CODE CRIM.PROC.ANN. art. 1.13 (Vernon Supp.1995). Bridgewater's true complaint appears to be that where the State waives the death penalty in a capital murder case, the mandatory life sentence prescribed by TEX.PENAL CODE ANN. § 12.31(a) (Vernon 1994) violates the Eighth and Fourteenth Amendments of the U.S. Constitution because no punishment hearing occurs where mitigating factors can be considered.

In support of his point of error, Bridgewater cites several U.S. Supreme Court death penalty cases that basically hold that a State cannot prevent a sentencer from considering mitigating evidence in determining whether to impose the death penalty.[6] *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Bridgewater argues that the rationale underlying these Supreme Court decisions should be extended to make the mandatory sentence of life in a capital murder case unconstitutional where the State waives the death penalty. The Supreme Court, however, expressly rejected Bridgewater's argument that the individualized capital sentencing doctrine should be extended outside the death penalty context. *Harmelin v. Michigan,* 501 U.S. 957, 995–97, 111 S.Ct. 2680, 2702, 115 L.Ed.2d 836 (1991); *see also United States v. LaFleur,* 971 F.2d 200, 211 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 1292, 122 L.Ed.2d 683 (1993). In explaining this, the Supreme Court stated:

> Our cases creating and clarifying the "individualized capital sentencing doctrine" have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties.
>
> The penalty of death differs from all other forms of criminal punishment, not in degree but in kind. It is unique in its total irrevocability. It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

*Harmelin,* 501 U.S. at 995, 111 S.Ct. at 2702 (citations omitted).[7] Accordingly, we overrule point of error five.

We affirm the trial court's judgment.

---

6. The rule cited in these death penalty cases is known as the "individualized capital sentencing doctrine." *See Harmelin v. Michigan,* 501 U.S. 957, 995, 111 S.Ct. 2680, 2702, 115 L.Ed.2d 836 (1991).

7. In *Harmelin,* the defendant claimed that his mandatory life sentence without parole for a drug offense violated his protection against cruel and unusual punishment because it did not provide for the consideration of mitigating evidence. *Harmelin,* 501 U.S. at 994–95, 111 S.Ct. at 2701.